UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
VIGILANT INSURANCE CO.,
a/s/o PASTERNAK, BAUM & CO.

                         Plaintiff,

    -against-                               06 Civ. 2806 (KMW)

                                            OPINION AND ORDER

M/T "CLIPPER LEGACY," et al.,

                         Defendants.
------------------------------------x
KIMBA M. WOOD, U.S.D.J.:

    Plaintiff Vigilant Insurance Company ("Plaintiff") brings

this action as subrogee of Pasternak Baum & Co., Inc.

("Pasternak"), the owner and shipper of certain cargo, against

defendants Clipper Wonsild, Inc., Clipper Fourth Legacy, Ltd.,

and related entities (collectively "Defendants"), the carrier of

that cargo.

    Plaintiff alleges that a shipment of approximately 1900

metric tons of crude ground peanut oil carried by Defendants'

tanker, the M/T Clipper Legacy, from Corinto, Nicaragua to New

Orleans, Louisiana, pursuant to a contract for carriage between

Pasternak and Defendants, was rejected in part by Pasternak's

buyer in the United States because of improper storage and

possible contamination during the voyage.  Plaintiff contends

that Defendants' failure to properly stow the cargo constitutes a

violation of the contract for carriage, and seeks damages in the

1

amount of $231,963.34 for, <u>inter alia</u>, losses sustained as a result of the rejected cargo shipment.

Defendants have moved for partial summary judgment, seeking to restrict their liability to $500 pursuant to Section 4(5) of the Carriage of Goods by Sea Act ("COGSA"), which limits a carrier's liability for goods lost or damaged in foreign trade to $500 per "package" or, for goods not shipped in packages - as in this case - to $500 per "customary freight unit."  46 U.S.C. § 30701 note (previously codified at 46 U.S.C. App. § 1304(5)).

Specifically, Defendants argue that the customary freight unit in this case was the entire peanut oil shipment, and that accordingly their liability is limited under COGSA to $500. Plaintiff responds, arguing (1) that the customary freight unit in this case was each metric ton of peanut oil shipped, which would limit Defendants' liability under COGSA to $500 for each of the 303.736 metric tons of allegedly contaminated cargo (or, $151,500); and (2) that, in any case, COGSA's limitation of liability should not apply to this shipment because Defendants deviated from the terms of their contract for carriage.

For the reasons stated below, the Court concludes, first, that the customary freight unit for this shipment is the entire peanut oil shipment, and second, that the Defendants' alleged deviation in this case does not void COGSA's limitation of liability.  Therefore, the Court GRANTS Defendants' motion for

partial summary judgment, limiting Defendants' liability to $500.

**BACKGROUND**

I.   FACTS

Unless otherwise noted, the following facts are undisputed and are derived from the parties' Local Rule 56.1 statements, affidavits, and other submissions.[1]

A.   The Parties and Prior Course of Dealing

Plaintiff brings this action on behalf of its insured, Pasternak.  Pasternak is an agricultural and commodity broker. Defendants are part of a leading international shipping consortium, which owns or operates more than 300 ocean-going vessels.  Pasternak and Defendants have a history of commercial dealings for the ocean transportation of certain bulk liquid cargoes (mainly, vegetable oils).

In November 2004, Pasternak and Defendants agreed upon certain terms and conditions that would apply to future shipments of Pasternak cargo by Defendants.  Defs.' Local Rule 56.1

---

[1] The Court notes that Defendants have not submitted an affidavit authenticating documents attached to their Local Rule 56.1 Statement.  Generally, for a document to be admissible for purposes of a motion for summary judgment, it must be authenticated by, and attached to, an affidavit meeting the requirements of Federal Rule of Civil Procedure 56(e).  However, uncertified or otherwise inadmissible documents may nonetheless be considered by the court on a motion for summary judgment if not challenged by the opposing party.  See H. Sand & Co., Inc. v. Airtemp Corp., 934 F.2d 450, 454-55 (2d Cir. 1991); 10A Wright, Miller & Kayne, Federal Practice and Procedure § 2722, at 382-85 (3d ed. 1998).  Plaintiff made no such challenge.

Statement ¶ 11; <u>see</u> Defs.' Stat. Ex. D-2; Maz. Aff. Ex. 3 ("November 2004 Freight Terms").  The parties refer to each of these individual shipments as "fixtures," and the parties refer to the documents memorializing each of these individual fixtures as "fixture confirmations."

    B.   <u>The February 23, 2005 Fixture Confirmation</u>

In February 2005 Pasternak proposed to ship 1,500 metric tons of crude ground peanut oil from Corinto, Nicaragua to New Orleans, Louisiana on board vessels owned or operated by Defendants.  Defs.' Stat. ¶¶ 9-10.  A "fixture confirmation" for the shipment, dated February 23, 2005, specified that Pasternak would pay a lump sum freight amount of $90,000 for the entire shipment.  Defs.' Stat. Ex. D-1; Sanchez Decl. Ex. 1 ("February 23, 2005 fixture confirmation").

The February 23, 2005 fixture confirmation incorporated the previously agreed upon November 2004 Freight Terms, and "Vegoilvoy C/P," which refers to the terms and conditions of the standard Vegoilvoy (vegetable oil voyage) charter party form contract.[2]  Defs.' Stat. ¶ 13; Ex. D-3.

    C.   <u>Changes to the Agreement</u>

---

[2] In this context, the term "charter party" refers to "a special contract between the shipowner and charterer, [especially] for the carriage of goods by sea." BLACK'S LAW DICTIONARY 229 (7th ed. 1999).  The charter party for this shipment appears to encompass the February 23, 2005 fixture confirmation, the Vegoilvoy standard charter party, and the November 2004 Freight Terms.

4

Following the February 23, 2005 fixture confirmation, Pasternak advised Defendants it wished to increase the quantity of peanut oil shipped on the April voyage to 1700 metric tons. The amount was later increased again to 1900 metric tons. Despite these increases, there was no adjustment to the $90,000 lump sum freight amount.  Instead, the parties agreed that, as a result of the increase of 400 metric tons on the April vessel, the quantity on an upcoming June shipment would be reduced from 1500 metric tons to 1100 metric tons.  Defs.' Stat. ¶ 15; Sanchez Decl. ¶ 11; Ex. 1.

D.   The Bill of Lading

A bill of lading, dated April 7, 2005, was issued for the Nicaragua to New Orleans voyage.  Defs. Stat. ¶ 23; Hilse Decl. Ex. 1.  The bill of lading described the quantity to be shipped as 1,905.230 metric tons of crude Nicaraguan groundnut oil and specified a rate of freight as follows:  "Freight Payable as Per Charter Party dated 23/02/2005."  Hilse Decl. Ex. 1.  As noted above, the February 23, 2005 fixture confirmation/charter party stated a freight rate of $90,000 lump sum for the shipment.[3]

The bill of lading incorporated "[a]ll terms, conditions, liberties, and exceptions of the charter party dated Feb. 23,

---

[3]  Defendant Clipper Wonsild also issued an invoice to Pasternak, dated April 11, 2005, confirming the carriage of 1,905.230 metric tons of peanut oil for the amount of $90,000 lump sum freight.  Defs.' Stat. ¶ 24; Ex. C.

2005," and, in a paragraph known as a USA PARAMOUNT CLAUSE, incorporated the provisions of COGSA to the extent COGSA applies to the shipment of the goods by reason of the port of loading or discharge.  Hilse Decl. Ex. 1.  As noted above, Section 4(5) of COGSA permits a carrier to limit its liability for lost or damaged goods to $500 per "customary freight unit."[4]

E.    Prior Cargo Stowage Restriction

Clause "01" of the November 2004 Freight Terms between the parties specified the proper means of storing bulk liquid cargo on Defendants' vessels:  "Last three cargoes clean and unleaded. The last cargo to be mutually agreed upon for every fixture."[5] Defs.' Stat. Ex. D-2; Maz. Aff. Ex. 3.  For this voyage, the parties agreed that the "last cargo" in each of the tanks transporting the peanut oil must be on the "NIOP 2 acceptable list."  Defs.' Stat. Ex. D-1; Sanchez Decl. Ex. 1.  The "NIOP 2" list refers to the industry-wide list of acceptable chemicals for bulk liquid transport of vegetable oil.

F.    Rejection of the Cargo

---

[4] "Clause 33" of the November 2004 Freight Terms (as noted above, incorporated into the February 23, 2005 charter party) references a "USA PARAMOUNT CLAUSE," i.e., an agreement to make bills of lading issued under the charter party subject to COGSA. Defs.' Stat. Ex. D-2; Maz. Aff. Ex. 3.

[5] The November 2004 Freight Terms also provide, in Clause 30, that "[a]ny deviation from these clauses, unless otherwise negotiated or subsequently agreed, are to be solely at the risk, cost and consequence of the negligent party."  Defs.' Stat. Ex. D-2; Maz. Aff. Ex. 3.

At port in Nicaragua, a surveyor on site reported the following loaded quantities of peanut oil:  801.374 metric tons in Tank 3P, 801.885 metric tons in Tank 3S, and 303.736 in Tank 4C.  Defs. Stat. ¶ 22; Ex. F.  However, at some point prior to the vessel's arrival in New Orleans, Pasternak's customer, Ventura Foods, LLC, rejected the 303.736 metric tons of peanut oil carried in Tank 4C because it learned the last prior cargo carried in that stowage tank was naptha, a prior cargo not on the "NIOP 2" acceptable cargo list, which would, Plaintiff alleges, expose the cargo to possible contamination.  Defs. Stat. ¶ 25; Hilse Decl. ¶¶ 9-14; Exs. 1-4.

Plaintiff brought this action as subrogee of its insured, Pasternak, for the $218,762.34 claim payment made to Pasternak on account of the rejected cargo shipment.

II.  <u>PROCEDURAL HISTORY</u>

Plaintiff initiated this action against Defendants in April 2006, alleging breach of contract and negligence, and seeking to recover the value of the rejected cargo shipment.  In September 2007, Defendants requested leave to file a motion for partial summary judgment on the ground that Defendants' liability should be limited to $500 pursuant to the applicable COGSA provisions. The Court denied Defendants' request and ordered the parties to first submit Local Rule 56.1 Statements.  After reviewing the parties' submissions, the Court permitted Defendants to file a

motion for partial summary judgment.  This motion followed.

III. <u>SUMMARY JUDGMENT STANDARD</u>

     Summary judgment is warranted if the pleadings, affidavits, and disclosures that form the record establish that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); <u>see</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986); <u>Guilbert v. Gardner</u>, 480 F. 3d 140, 145 (2d Cir. 2007).  In deciding a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party and must draw all reasonable inferences in the non-moving party's favor.  <u>In re "Agent Orange" Prod. Liab. Litig.</u>, 517 F.3d 76, 87 (2d Cir. 2008).  Summary judgment should be denied "if the evidence is such that a reasonable jury could return a verdict" in favor of the non-moving party.  <u>NetJets Aviation, Inc. v. LHC Commc'ns, LLC</u>, 537 F.3d 168, 178-79 (2d Cir. 2008). <u>     </u>

**<u>DISCUSSION</u>**

<u>    </u>The questions presented on this motion are (1) what should be deemed the COGSA customary freight unit, and (2) whether Defendants' alleged breach of the prior-cargo stowage restriction constitutes a material deviation voiding COGSA's limitation of liability.  The Court addresses these questions in turn.

I.    <u>LIMITATION OF LIABILITY  </u>

<u>    </u>Section 4(5) of COGSA creates a limitation on the carrier's

liability for loss or damage of goods in transport in foreign

trade.[6]  It provides:

> Neither the carrier nor the ship shall in any event
> become liable for any loss or damage to or in
> connection with the transportation of goods in an
> amount exceeding $500 per package . . ., or <u>in the case
> of goods not shipped in packages, per customary freight
> unit</u> . . . unless the nature and value of such goods
> have been declared by the shipper before shipment and
> inserted in the bill of lading.

COGSA § 4(5)(emphasis added).  In this case, there was no

declaration of the value of the goods in the bill of lading.

COGSA thus limits the carrier's liability here to $500 per

"customary freight unit."[7]

        In the Second Circuit, "customary freight unit" is defined

as "the actual freight unit used by the parties to calculate

freight for the shipment at issue."[8]  <u>FMC Corp. v. S.S. Marjorie

Lykes</u>, 851 F.2d 78, 80 (2d Cir. 1988).

---

[6] COGSA applies to "[e]very bill of lading or similar document
of title which is evidence of a contract for the carriage of goods
by sea [in foreign trade] to or from ports of the United States."
46 U.S.C. § 30701 note.  The bill of lading in this case, as
evidence of a shipment of peanut oil from Nicaragua to a port in
the United States, therefore is subject to COGSA's provisions.

[7] Although COGSA's provisions are not applicable to "charter
parties" themselves, COGSA § 5, COGSA's provisions do apply, as in
this case, to "any bill of lading or any similar document . . .
issued under or pursuant to a charter party." <u>Id.</u>

[8] There is no definition of either "package" or "customary
freight unit" in the statute, and the legislative history of the
Act provides little guidance as to the application of the terms.
<u>See, e.g.</u>, <u>Caterpillar Overseas S.A. v. Marine Transp., Inc.</u>, 900
F.2d 714, 722 (4th Cir. 1990).

To determine the customary freight unit for a particular
shipment, "the district court should examine the bill of lading,
which expresses the 'contractual relationship in which the intent
of the parties is the overarching standard.'" <u>Marjorie Lykes</u>,
851 F.2d at 80 (quoting <u>Allied Int'l v. S.S. Yang Ming</u>, 672 F.2d
1055, 1061 (2d Cir. 1982)).[9]  "Entries on the bill of lading
evidence the intent of the parties," <u>D.W.E. Corp. v. T.F.L.
Freedom</u>, 704 F. Supp. 380, 383 (S.D.N.Y. 1989), and absent any
ambiguity there, "there is no need for the district court to
consider any of the parties' earlier negotiations." <u>Marjorie
Lykes</u>, 851 F.2d at 81.  "[T]he inquiry is ended, and both parties
are bound to the freight unit therein adopted."[10]  <u>Id.</u>

Defendants argue that the customary freight unit is the
<u>entire shipment</u> of peanut oil because a flat rate of $90,000 was
charged for the entire shipment.  Plaintiff argues that the
customary freight unit is each <u>metric ton</u> of peanut oil because
the parties arrived at the $90,000 price using a freight rate of
$60 per metric ton for the 1500 metric tons proposed to be
shipped.  As set forth below, the Court agrees with Defendants

_____

[9] A district court may also consider the tariff filed with the
Federal Maritime Commission, which may also set forth the freight
rate.  <u>Marjorie Lykes</u>, 851 F.2d at 80.  No such tariff, however,
was filed with the Commission in connection with this shipment.

[10] Thus, where the bill of lading and tariff are unambiguous,
determination of the "customary freight unit" is a matter of
interpretation of documents and does not involve questions of fact.
<u>See</u> <u>D.W.E. Corp.</u>, 704 F. Supp. at 385.

that the "customary freight unit" is the entire shipment.

    A.   <u>The Bill of Lading</u>

Where a flat rate is charged per shipping unit, that unit will be, absent any ambiguity in the bill of lading or tariff, the COGSA customary freight unit.  <u>See, e.g.</u>, <u>Marjorie Lykes</u>, 851 F.2d at 80-81 (where flat rate was charged for each of 30 fire engines shipped, each fire engine was the COGSA customary freight unit); <u>accord</u> <u>General Motors Corp. v. Moore-McCormack Lines, Inc.</u>, 451 F.2d 24, 25-26 (2d Cir. 1971) (per curium); <u>Petition of Isbrandsten</u>, 201 F.2d 281, 285-86 (2d Cir. 1953); <u>D.W.E. Corp.</u>, 704 F. Supp. at 385-86.  Moreover, where a flat rate is charged for an entire shipment of cargo, the customary freight unit will be the entire shipment.  <u>See</u> <u>Ulrich Ammann Building Equipment, Ltd v. M/V Monsun</u>, 609 F. Supp. 87, 89-90 (S.D.N.Y. 1985); <u>infra</u> pp. 12-13.

In this case, the bill of lading specifies the freight amount as payable "Per Charter Party Dated February 23, 2005," which recites the rate as $90,000 lump sum.  The parties do not dispute that the $90,000 amount was charged for the entire peanut oil shipment.  Thus, the customary freight unit is the entire shipment because, as Defendants contend, that is the unit on which the $90,000 freight rate was charged.

Plaintiff argues that the bill of lading here is at least ambiguous because it describes the goods to be shipped on a

metric ton basis, and not as a single lot or transport oil.[11]
The Court disagrees.  Under COGSA, it is not the unit used to
describe the goods, but the unit on which <u>freight</u> is charged,
that determines the customary freight unit.  <u>See</u> <u>Petition of
Isbrandtsen</u>, 201 F.2d at 286; <u>Ulrich Ammann</u>, 609 F. Supp. at 89.

For example, in <u>Ulrich Ammann</u>, the parties agreed to a lump
sum rate for an entire shipment of 30 Caterpillar tractors.  In
granting partial summary judgment in favor of the carrier, the
court held that the relevant customary freight unit was <u>not</u> each
of the 30 tractors identified in the bill of lading, but was
instead the <u>entire shipment</u>.  <u>See id.</u> at 89-90.

Furthermore, in a decision involving bulk <u>liquid</u> transport
of silicone resin, the court in <u>Union Carbide Corp. v. M/V
Michele</u>, 764 F. Supp. 783 (S.D.N.Y. 1990), concluded that the
"customary freight unit . . . was the transportable tank
[containing the resin] since the freight charge was computed on a
lump sum basis for the entire shipment."  <u>Id.</u> at 786.  Again, in
granting partial summary judgment in favor of the carrier, the
court found the customary freight unit was the entire 20 foot

_____

[11] Plaintiff also claims that the bill of lading is ambiguous
because it fails to express the $90,000 freight amount as
calculated based on a "per unit" amount (here, the entire
shipment).  While such "per unit" expressions of the freight amount
appear to be common practice in cases involving the shipment of
containers or itemized cargos, <u>see, e.g</u>, <u>D.W.E. Corp.</u>, 704 F. Supp.
at 386, the Court discerns no such requirement within the COGSA
framework.  <u>See</u> <u>Union Carbide Corp. v. M/V Michele</u>, 764 F. Supp.
783, 786 (S.D.N.Y. 1990)

tank, despite the apparent absence of any reference on the bill
of lading to a single container or lot as the item to be
shipped.[12]

The bill of lading, and in this case the charter party
fixture incorporated therein, is similarly clear and unambiguous
with respect to the unit on which the parties computed freight,
that is, the entire shipment.[13]   Accordingly, the Court
concludes the "customary freight unit" is the entire shipment of
peanut oil.

B.   Parol Evidence

Plaintiff also submits evidence of custom and usage in the
industry, as well as evidence of Pasternak's and Defendants'
prior course of dealing, in an attempt to show that when

---

[12] The court in Union Carbide, moreover, did not espouse any
different rule for bulk liquid cargo.  764 F. Supp. 783 (S.D.N.Y.
1990).  To the extent Plaintiff is arguing that a different rule
applies to bulk liquid cargo, the Court rejects Plaintiff's
approach.  First, it would be in tension with the Second Circuit's
admonition that, for COGSA limitation purposes, courts should focus
on the freight unit actually used by the parties, and not on the
usual or customary freight unit used in the particular trade.
Marjorie Lykes, 851 F.2d at 80.  Second, such an approach – applying
a different rule for carriers under COGSA depending on the
underlying and at times unknown nature of the cargo – would
undermine COGSA's policy rationale of "foster[ing] certainty and
security in the shipping business." Yang Ming, 672 F.2d at 1057.

[13] Plaintiff argues in the alternative that Plaintiff stands
in the shoes of its subrogor's customer, Ventura, and that its
claim thus arises not from the charter party, but rather from the
bill of lading.  Even if that were the case, the same result would
obtain, because the bill of lading states that the freight rate is
contained in the charter party.  See Hilse Decl. Ex. 1.

transporting bulk liquid cargoes it is customary to describe the
cargo, and to calculate and express freight rates, on a metric
ton basis.  <u>See</u> Plaintiff's Local Rule 56.1 Statement ¶¶ C-K.
Although such evidence may be relevant to the intent of the
parties in agreeing on a freight rate and unit for a particular
shipment, courts should not look to such evidence if the freight
rate and unit is clearly established in the bill of lading (in
this case, a lump sum freight on the entire shipment).  <u>Marjorie
Lykes</u>, 851 F.2d at 80; <u>see also</u> <u>id.</u> at 81 ("[R]elying on the
express language of the bill of lading . . . will 'foster
certainty and security in the shipping business.'") (internal
citations omitted).

Thus, even assuming, as Plaintiff alleges, that the $90,000
amount was in fact the product of multiplying each metric ton
proposed to be shipped by $60 (and the lump sum amount expressed
in the charter party fixture was nothing more than a ready
approximation of that calculation), the metric ton unit does not
thereby become under COGSA the freight unit for shipment.[14]  <u>See
Ulrich Ammann</u>, 609 F. Supp. at 91 ("[E]ven where a lump sum
freight is arrived at by using weight and measurement, the

---

[14] Plaintiff's reliance on <u>Brasil Oiticica v. M/S Bill</u>, 55 F.
Supp. 780, 783 (D. Md. 1944) ("THE BILL") is misplaced.  Although
the decision concerned the bulk shipment of oil under COGSA, the
court interpreted the phrase "customary freight unit" as the unit
"customarily used" to calculate freight - an approach expressly
rejected by the Second Circuit.  <u>Marjorie Lykes</u>, 851 F.2d at 80.

weight/measurement does not become the freight unit for the transaction.").

In the absence of a contrary agreement of the parties expressed in the bill of lading, the Court is bound by COGSA to enforce the statutory limit of $500 per customary freight unit, which the Court finds is the entire shipment.   The shipper "could have declared a higher value than $500 for each unit," or it "could have insisted that the bill of lading calculate freight based on a different unit" (that is, on a basis other than lump sum).  See Marjorie Lykes, 851 F.2d at 81.  Here, Pasternak did neither.  Accordingly, Defendants' liability is limited under to COGSA to $500.

II.  <u>DOCTRINE OF DEVIATION</u>

Plaintiff also argues that Defendants' breach of the NIOP 2 prior-cargo stowage restriction constitutes a material deviation from the contract for carriage, which voids the COGSA limitation of liability.  The Court disagrees.

Under certain circumstances, a carrier's unreasonable deviation from the contract for carriage bars a carrier from invoking a statutory or contractual limitation of liability.  The Second Circuit, however, has "carefully limited" the deviation doctrine to instances of (1) geographic deviation of the vessel and (2) unauthorized on-deck stowage of the cargo (quasi-deviation),  <u>Sedco, Inc. v. S.S. Strathewe</u>, 800 F.2d 27, 31-32

15

(2d Cir. 1986), and has stated that the doctrine, which courts developed pre-COGSA, should not be extended beyond these categories.[15]  <u>Id.</u> at 31; <u>see</u> <u>B.M.A. Indus., Ltd. v. Nigerian Star Line</u>, 786 F.2d 90, 91-92 (2d Cir. 1986) (per curiam).

In this case, the alleged violation of the NIOP 2 prior-cargo stowage restriction fits neither of the two types of deviation recognized in the Second Circuit – geographic deviation or unauthorized on-deck stowage – and Plaintiff does not argue otherwise.  Plaintiff, recognizing the courts' "reluctance to liberally apply the admiralty deviation doctrine," argues instead that the doctrine should apply to preclude liability in the context of at least "this private contract."  Specifically, Plaintiff relies on "Clause 30" of the November 2004 Freight Terms, which provides that: "[a]ny deviation from these clauses, unless otherwise negotiated or agreed, are to be solely at the risk, cost and consequence of the negligent party."

Plaintiff, however, provides no evidence that this provision, which does not refer to any statutory or contractual limitation of liability, was intended either to (1) displace COGSA's application to lost or damaged cargo resulting from a

_____

[15] The evolution of the deviation doctrine is well-summarized by the court in <u>Sedco</u>, 800 F.2d at 31-32 (2d Cir. 1986); <u>see also</u> G. Gilmore & C. Black, <u>The Law of Admiralty</u> § 3-42, at 183 (2d ed. 1975) ("It would seem unwise to extend analogically and by way of metaphor a doctrine of doubtful justice under modern conditions, of questionable status under COGSA, and of highly penal effect.").

16

deviation of the November 2004 Freight Terms, or (2) broaden the admiralty deviation doctrine such that it would embrace, by the clause's terms, "any" deviation (or, as Plaintiff actually argues, any "material" deviation) from these freight terms.[16] Plaintiff fails to cite any relevant authority, in the record or in the case law, to support such a result.[17]   See Sedco, 800 F.2d at 32 (specifically rejecting the proposition that any carrier misconduct amounting to a "material breach" of the contract for carriage constitutes a deviation that would void a carrier's limitation of liability).

Thus, Plaintiff cannot avoid COGSA's limitation of liability clause through its allegation that Defendants violated the last-prior cargo restriction of the contract for carriage.  This violation does not constitute either a geographic deviation or a quasi-deviation that, consistent with Second Circuit precedent,

---

[16] By contrast, Section 23(b) of the Vegoilvoy C/P, entitled "Limitations of Liability," provides that the owner and vessel "shall be entitled to the like privileges, rights, and immunities as are contained in Sections 3(6),4, and 11 of the Carriage of Goods by Sea Act . . . ." (emphasis added).  Moreover, "Clause 33" of the same November 2004 Freight Terms references a "USA PARAMOUNT CLAUSE," i.e., an agreement to make bills of lading issued under the charter party subject to COGSA.

[17] Plaintiff cites Nipponka Ins. Co., Ltd. v. Watkins Motor Lines, Inc., 431 F. Supp. 2d 411 (S.D.N.Y. 2006), and Praxair, Inc. v. Mayflower Transit, Inc., 919 F. Supp. 650 (S.D.N.Y. 1996). But Plaintiff's apparent reliance on those decisions is unfounded, for both Nipponka and Praxair involved the application of the material deviation doctrine to the shipment of goods by air and by land, and did not address or concern the deviation doctrine's carefully limited post-COGSA application.

17

voids a limitation of liability clause.

**CONCLUSION**

      The Court finds no genuine of issue of material fact for trial on the subject of Defendants' motion and that Defendants are entitled to judgment as a matter of law.  For the reasons stated above, Defendants' motion for partial summary judgment limiting Defendants' liability to $500 (D.E. 33) is GRANTED.

        SO ORDERED.


Dated:    New York, New York
         September  |  , 2009

                                       Kimba M. Wood
                         United States District Judge